Thank you. Please call the next case. Case 5-13-0145, Southern Illinois Medical Services v. Workers' Compensation Commission. You may proceed. May it please the Court, my name is Cheryl Intervalle. I'm here on behalf of Southern Illinois Medical Services. Just as a question before we get into this, we were all kind of wondering how we deal with two appellees, if you had a preference of which one went first, and I said I would ask. Does it matter? As long as they split their time. They understand they've got to split their time. You split the time if you have two appellees. So it's your choice. Yeah, I mean, you know, and how you split it is your agreement between the two of you. Just, if you would be so kind, let our clerk know so we can give you forewarning when your time is approaching. As the case has funneled up, you and the claimant have become allies. I've become allies with both of them this time. It's a wonderful morning. A unique day. In fact, today we'll just have it all be strange. There are two issues on appeal. The first was, this is a traumatic injury, well it's a repetitive trauma claim. Amber Shirley worked initially for Southern Illinois Medical Services and the business changed hands over a weekend and when she came in the following Monday it was Physician Surgery Center. With that said, when the arbitrator heard the case, he found the manifestation date was May 21st and when it got appealed at the commission, they pushed it back to January 6th, 2009. The other issue is whether or not the arbitrator and the commission correctly found that she had a shoulder injury. In this case, the senator refused to manifest weight of the evidence, so we've got the mountain that we're going to go up today. The commission's changing of the manifestation date was based on the testimony of Ms. Hankins and the petition. And if you took the statements that they initially made during the arbitration hearing, we'd be good. We wouldn't have an argument here at all. The problem is that all of these people had cross-examination and when the cross-examination came out, it was very clear that nobody really knew what any of the dates were. Apparently Ms. Hankins and Ms. Shirley spoke at some point between October and December. There are no dates. That was the first conversation. Paperwork was filled out. Again, we have this gamut of dates of when this was. I tried to pin down Ms. Hankins as to when she thought that was, and she thought it was right before she went to get medical treatment. Well, that would be great, but she didn't get medical treatment until April, so that would mean it couldn't have been January 6th. Did she list the accident date of January 6th? She had eight applications. Oh, she did? Yeah, and that's part of the problem that we're kind of running into with these repetitive trauma cases, because we don't really have a hard and fast standard. We have when the reasonable person would be aware of the facts of the injury, and to some extent the Duran case really helped us, because in the Duran case, and the facts are very similar, the petitioner in Duran gets up and says, you know, I thought I might have carpal tunnel. I've heard of it. I don't know if I have it. I might have it. I could have had it. I did tell my employer that I might have had it, and the Supreme Court was like, you know what? No, the fact that you thought you might have had it really isn't going to work here. You know, and albeit there was a statute of limitations issue, so, you know, you have that going forward as well. But with that said, if you look at it practically, at some point we're going to probably have to figure out a standard that everybody can abide by instead of having eight claims filed, they can reduce it to four. But the difficult thing, the difficult thing in Duran is the woman said, yes, I thought I had it. Yes, I thought it may be work-related. The Supreme Court turns around and said, this is a fact issue to be decided by the Commission. The Commission says that was her manifest date, and the Supreme Court says, no, you're wrong. Now, does that make sense to you? And that's exactly what the Supreme Court did in Duran. It is exactly what they did. So where is the manifestation date? Any place it has to be so that you sustain a cause of action? Well, and interestingly, they didn't actually pick the date, but they certainly made it clear in the dicta what they thought the date should be. And with that said, in this case, it's very similar. But you can say is there substantial support for the idea of date? And what did they clearly say what the date should be? I'm sorry? What did they clearly say they thought the date should be? Who, the Supreme Court? Correct, yes. The later date, so it would be within the statute of limitations. Yeah. I think it was June, but I can't remember. Yeah, well, clearly. That's exactly what they did. They said the later date so it wasn't time to work. But, I mean, here's where we end up in this case. If we just take the initial testimony at face value, you could say there's support for it. But in the great grand scheme of things, when you look at what these people said on cross-examination, Petitioner's own lawyer asked her at the hearing, did you know this was a work-related injury on this date? She said, no. So how do we get, oh, the Petitioner's testimony supports this. Not really. And obviously Ms. Hankins isn't in there either. And the reason this becomes an issue is when you have them getting seen by a doctor, they finally get a diagnosis, that's great. We know what we're all dealing with now. The doctor hooks it up in May so we have it just as clean as can be. She doesn't get surgery for over a year after that. So now we're going to have her off work paying TTD at a prior jobs rate that was actually less than what her rate was at the job she was at because we've now pushed it back. And you kind of get into this quandary of, well, shouldn't we be paying them what they were actually making if that's their injury date, the one year before the manifestation date? That makes sense because that's what they would have been earning. But in this case, I truly believe this is against the manifest way of the evidence. You cannot just pick and choose what you want out of the evidence. You have to take their testimony in full. And the initial questions were very leading questions, and that's fine. That's how it's done at the docket. But with that said, when they actually have to answer the question, it should probably be close. And in this case, it wasn't. I mean, we have the petitioner flat out saying, no, I did not know it was a work injury. And it's her. She is the reasonable person, according to Durand. It's the reasonable employee. It is her thought that matters as to when she thought her injury was work-related. And she's saying, no, I didn't think it was. It's not her thought, it's what a reasonable person. Well, a reasonable person. Because the person could be saying, I have no idea. It's absolutely plainly apparent that anybody wouldn't know. And that's the other problem with Ms. Hankins. Yeah, well, see, that's the problem with Ms. Hankins. Because Ms. Hankins actually testified that other people who'd been in this job had had the same problem. So she's got a lot more knowledge than what maybe Ms. Shirley may have had, or certainly what the average employee would have, because she's seen it before. So we can't really attribute what she knows to the reasonable person either. I mean, in this case, she sought medical treatment in April. She gets the testing. The doctor says it's positive, but doesn't say anything else about it. He says, you need to go see Dr. Brown. So she goes to see Dr. Brown on May 21st. He says, you know what, you've got bilateral cubital tunnel syndrome. I think you've got a shoulder injury, and I think they're related to your job. And I mean, it doesn't get more clear than it is spelled out, ABC. Not this pick a date from October to March. And that's what we have. It's like a go fish of dates. And at some point, it should be the most reasonable. It should, well, it's a manifest way, but in all honesty, it should be the most reasonable. It should be the one, you know, right before they're going to take off work so they get paid what they're supposed to get paid while they're off. And so it's our position that the manifestation date should not have been switched to January of 2009. It should go back to the May 21st, 2009. Because the testimony that's underlying that the commission relied upon is basically a half-truth in the beginning in their decision. And if you look at the entire testimony, it does not stand up. The other issue that we have on appeal is whether or not she actually had a shoulder injury. And there's no doubt when she went to see Dr. Brown on May 21st, that same date, we get right back to it. He said, you've got shoulder pain, maybe impingement, maybe a laxity thing. Okay, I think it's related to your job. Got it. Okay. If that's all that happened, I would not be standing here today. He gets an MRI and says, yeah, there might be something there. But again, you know what, it may be normal. Let's give her some therapy, see how it goes. And if it doesn't get better, we'll do some arthroscopic surgery. Okay. She gets the arthroscopic surgery. Every finding during that surgery is normal, except for one. She has a laxity problem. I say laxity problem because it was her shoulder. And that alone would be great if that was all there was to it. Again, I wouldn't be standing here. It was identical to the one they found on the other side, which was not an injured body part. It was the unsymptomatic shoulder. But she never had any complaints, didn't file a claim on, nothing. That is the only injury that was found. Clearly, it was not work-related if it's on both sides. And she only was complaining about it on one. In January of 2009, did she advise Hankins that she thought that her problems were associated with work? She said she did at one point. And then when her counsel asked her to clarify it on cross-examination, I believe when that question was asked, it was by your office, Mr. Howard's office. And then when Ms. Rich's office asked them on cross, did you know that it was related? And she said no. But the first question was, did you think? Let's get to the real basics. Okay. How is this different than the discovery rule in tort cases? It's not when she knows. It's when a reasonable person should be put on inquiry. Was she possessed of sufficient information that a reasonable person would be put on inquiry to determine whether her condition was work-related? Is that what triggers it? Is that the manifestation date? I don't think so. So it's different than the discovery rule. It would be great if it was actually worded that clearly. Well, that's the discovery rule in tort. I've just given it to you almost word for word. Yeah, and that's where we were when it went up to the Supreme Court. The Supreme Court said, no, the fact that you thought about it, the fact that you thought that it might be, is not good enough. You have to know. And it's like, okay, well, if we're going to go with no, then clearly we weren't at no until Dr. Brown told us. Well, the Supreme Court doesn't say inquiry. They say it must be not just a reasonable person would think it might be or have inquired. It must be plainly apparent to a reasonable person. So it's entirely different than the discovery rule on the tort side. It's a different concept. One only requires the reasonable person to be put on inquiry, and under Duran it must be plainly apparent to the reasonable person. Which must be the difference between thinking you have it and knowing you have it, because it's not plainly apparent until you know. And in which case, based on her own testimony, she didn't know until Dr. Brown told her. She told her that no one had diagnosed her, no one had looked at that before, then that was it. If I can call out your position, you seem to be saying that the claimant's testimony was contradictory. She was all over the place. They both were, to be fair. Assuming that that's accurate, though, we do have the well-set rule, as you know, that it's up to the commission to judge the credibility and resolve conflicts in the evidence. So why can't it be found in favor of the claimant on the basis there is sufficient evidence if they call out what they believe supports that conclusion? Because you're not saying there was no evidence in the record, are you? That she indicated it was January 6th or that she was all over the map? Well, if they hadn't both been all over the map, then, yeah, we'd be okay. The problem is they say in the decision, we are changing this based on the testimony of Ms. Hankins, which was supported by the petitioner. And Ms. Hankins went all over the board. It's like, okay, let's pin her down. When was this paperwork done? Well, that was done right before she went to the doctor's office. Well, that was April. That wasn't December, which is when you're in November, when you thought it was. And it certainly wasn't December when you thought she had a diagnosis. She had no clue. I mean, it sounded real good on direct. I can tell you that. It looked great in direct. But by the time you got to the end of the transcript, you were kind of going, wow, where do we have the date? And I'll admit, it's the manifest way to the evidence standard. Is there something in the record to support it? Yeah, but you're really cherry picking to do this. And if you're going to do that, there's no point to cross-examine a witness. And that's the problem with it. It's all on cross. And that is the testimony where there was no, it wasn't lead, it was, did you know if you had this injury? And according to her client, no, she didn't. Well, there is a point in cross-examining that you would persuade the prior effect. Yeah, but it's not supposed to be the exact opposite. I mean, if she says, you know what, I think that this is her date, it's January 6th, then she better have been getting treatment shortly after that. Her whole mindset of the treatment, the doctor visit, was four months after. It was totally off. None of it could be linked up. And like I said, if any of it could link up, you could say there was support for it in the record. But in this case, you can't because they're completely off the record. But what you do have is you have Dr. Brown's record sitting out there saying, hey, you've got cubital tunnel, I think it's related to your job. You've got a petitioner that says, yeah, I didn't know what I had. And there's another thing where she didn't really know what she had beforehand. Now we know what she has. He says it's birth related. Did Ms. Hankins think it was birth related? Probably. She'd seen it before. But we can't attribute that to the petitioner. It just doesn't add up. It's a house of cards, and the bottom cards aren't real sturdy. And that's the problem with this case. So we have asked that the manifestation date be moved back to the May 21, 2009 date because it is absolutely clear what happened then. And by using that date, she will also be in the job that she was working when she was off work so she would be paid at the rate of pay that she was making when she was at that job. Thank you, Your Honors. I'm Jim Gale. I'm representing Physician's Surgery Center. That's the one that the claim was made for the May 21 date. In the case law, there are a couple of concepts I think we have to keep in mind. Number one, as I said in Durand, a formal diagnosis is not required. The manifestation date is not the date on which the injury and its causal link to work become plainly apparent to a reasonable physician, but the date on which it became plainly apparent to a reasonable person. And as there's admonition in Durand, the facts must be closely examined in repetitive injury cases to ensure a fair result for both the faithful employee and the employer's insurer. As Durand says, the theme of the cases is fairness and flexibility. A string of cases are mentioned here. What it comes down to is you can't pick one thing and say it has to be the first day she knew about it. It has to be the last day before treatment. You have to look for fairness and flexibility. Consider what happened in this case. She started talking to them in November, December, saying, I think I have this problem, I think it's work-related. On or about January 6th, they had another discussion. There is no question, workers' compensation paperwork was filled out on or around January 6th. Is that the paperwork that was lost? Yes. You say there's no question. There was testimony about it being filled out, but then nobody could produce it. That's right. They agreed that it was lost, both she and the petitioner and Mrs. Hankins. That's kind of unusual, isn't it? It's not in the record, Your Honor, but what they said is this Kirk guy left, and there was a lot of paperwork they couldn't find. Okay. Unfortunate, but it happens. Anyway, you get to that point. First of all, there's no indication that she was not a reasonable person. She connected the dots around January and told them to the point that she filled out the paperwork. She testified that as of January, she had made up her mind to seek medical treatment. She did go to the doctor on April 10th, I believe it was, got the testing, and, yes, it's true that on May 21st, that's when she went to her specialist, between her history, the testing and all, that he gave the specific diagnosis, which Duran said was not needed. This is on direct examination, right? Which? This is on direct examination. Mr. Intervalli says, yeah, that's all well and good, but on cross-examination, she retracted that and went all over the place. What's your reaction to that argument? Well, I think there was uncertainty as to the precise date, but there's no uncertainty that it was around January 6th. I think the claim that it was very far from that date is incorrect. I don't think that's supported by the evidence. The evidence was it was around January 6th when she filled out the paperwork. So looking at, for the fairness to the employers, and it's not just insurers, it's two different employers here, she was working for SIMS, she got the symptoms under SIMS, she connected the dots and reported to SIMS. Her belief at the time that she filled out the paperwork was confirmed by her doctor later on. To the extent that you find causation, this is a SIMS case. It was mentioned that it was about a year before she got the surgery. Well, she testified that there was a problem with the worker's compensation insurance. Well, yeah, that's a question of who the employer was, so they were having trouble getting anyone to authorize it apparently. I don't think you'll find any evidence in there as contrasted with other cases that the condition was worsening. I think Durand is quite a bit different, and Durand, the person claiming had symptoms, she reported it, it was two and a half years later before she went to a doctor and said, I've been having these problems off and on for a year and a half. In our case, you have a steady stream. Figure how it is to get into doctors. I don't think there's any indication that there's any delay, or that the condition that she was treating for in April and through 2010, eventually the surgery, was any different than the one it was when she first reported it back in January. So I think you're talking about, I might say, administrative delays, not a matter of the condition got worse or she changed her mind about treatment or anything. So we think the commission's decision is supported by the evidence and must be affirmed. The court was right, and we feel that you should follow the same thing. Any questions, Your Honors? I believe there are. Thank you. Thank you, Mr. Dellin. Ms. Rich, you may respond. Thank you, Your Honors. May it please the Court, Ms. Introvaya and Mr. Gallin. I actually represent Ms. Shirley, the employee in this case. I actually agree, as you can see in my brief, with the manifestation date set forth by Ms. Introvaya. I believe that it's clear from my client's testimony at trial that back in January of 2009, she wasn't sure what condition she had. She wasn't sure whether it was related to her work or not. And I think that if you look at the Duran case, I think we deal with repetitive trauma cases frequently in my office, and Duran is a case that I work with a lot. And I'd say this is a case that is maybe one of the most similar to Duran that I've ever seen. And particularly if you look at the testimony of the employee in Duran, her testimony, the employee's testimony in Duran was even more strong than Ms. Shirley's was, that she felt that she probably had a work-related condition and that it was probably carpal tunnel. And even in that case, the Supreme Court said your understanding of your condition was sketchy and equivocal. You couldn't have based a claim on what you thought you might have known because you didn't know. So you're agreeing with Ms. Introvaya on the manifestation date? Correct, Your Honor. So therefore, what would you be asking us to do in light of that? I'm asking you to reinstate the arbitrator's manifestation date of May 21, 2009. Because I think if you don't, then we're getting into a very slippery slope here of what this case law in Duran actually means. That would essentially be requiring an employee, when they're having symptoms, to report a claim right away. Otherwise, their claim would be time-barred. I'm having symptoms, so therefore, I must know if something's going on within my body. Therefore, I have to report it. Otherwise, my claim would be time-barred. I think that that's not what Duran says, and I don't think that that is a fair and flexible standard, as Duran specifies that we need. So how did the Commission come up with the other date? Well, Your Honor, I'm honestly... I mean, they're well aware of Duran. Correct, and interestingly enough, they don't cite any case law to support their decision in this case. So I'm not exactly sure what they were relying on, other than what they tell us, which was simply the testimony of my client and then her supervisor. And I think if you have read their testimony, it's pretty clear that January 6, 2009, the only thing that occurred that we know of is that they potentially had a conversation in which my client told her supervisor that she was having symptoms. I think that's the only thing that's clear from the record in this case. So you agree with Ms. Intervalli on the manifestation date. Do you agree with her on anything else? I do not agree with her on the issue of causal connection with regard to the shoulder, Your Honor. Thank you. If you read Dr. Brown's first note, which I cited in my brief, he felt that she had impingement syndrome in her shoulder, some instability issues. At the time of these injuries, she was a healthy 30-year-old woman. She was 5'3", 130 pounds. She had never had any prior shoulder problems or problems with her hands or elbows up until this point. She testified that her job as an endoscopy specialist technician required her to essentially hold her left arm on top of a patient when they were performing these colonoscopy and other procedures so she could snake tubes throughout their body. And she was required to hold her left arm on the patient throughout that entire procedure to keep the pressure on them. Dr. Brown said, yes, I believe that that's why she's having these symptoms in her left shoulder. And all of the courts thus far, the arbitrator, the commission, the circuit court, found Dr. Brown's opinions on that to be credible. So I believe that the commission's decision with regard to the shoulder is supported by the manifest way to the evidence in this case. And she tried conservative treatment in this case for a year and a half before she actually underwent the, well, all of the surgeries that she underwent. She hoped that her condition would get better. She tried physical therapy for her shoulder and nothing seemed to help her symptoms. So Dr. Brown performed the arthroscopy. She testified at trial that the surgeries that he performed helped her. As you know, Section 8 of the Act requires an employer to be liable for all medical treatment that's required to diagnose, cure, relieve the effects of an injury. So even if the procedure was diagnostic in nature, that's still something that an employer is responsible for under the Act to find out what exactly is going on in this woman's shoulder, why is she having these problems, and she hasn't gotten any better with all the conservative treatment that she's had. So with regard to the shoulder, I do believe that the commission's decision, affirming the arbitrator's decision that a causal connection between her work duties and the shoulder is supported by the manifest way to the evidence. If there are no further questions, I believe that's all I really had. I don't believe there are. Thank you. Thank you. Your Honor, going back to the manifestation date issue and the argument that the Physician Surgery Center has set forth, there's been a lot made out about the fact that this girl filled out workers' compensation paperwork. Now her paperwork is not an application with the commission. It's something that she was providing to her employer. I don't know if that says that I really know this is a work accident because she certainly is testifying that it is not. But the testimony with this is in our brief. Ms. Shirley stated she originally filled it out in November or December with Kirk Kearney, and that's 320-321-337. She later stated she couldn't recall if she filled it out prior to or after January 6, 2009, C-338. When asked what she told her about her condition in the paperwork, she said, you know, I'm not even for sure. Okay, that's the petitioner's testimony. And then we have Ms. Hankins, who originally testifies that the incident report was filled out, she thought, in December of 2008. She reviewed it, didn't remember what was in it, and that was fine. So to try and figure out when all this happened, she was asked if Ms. Shirley had received any medical treatment at the time the report was completed. And she said she saw her family doctor regarding the discomfort and pain. When asked if it was before or after the paperwork, she said it would have been pretty close to the same time frame. Because we fill it out, they see the physician. When asked if she was aware when Ms. Shirley was actually diagnosed with the medical condition, she said, I believe it was the end of 2008. And therein lies the problem. She didn't see a doctor until April, and she didn't get diagnosed until May. So Ms. Hankins, you know, I appreciate you're trying to work from memory, I get it. But in this case, it's not there. I mean, this arbitrary date is not working when they both say, I don't know when I knew, and I didn't know then, and I thought I might, but I didn't know. Under Durand, it doesn't work. The other issue with regard to Ms. Rich's argument, with regard to the shoulder, yes. Diagnostic surgery, the employer would be responsible to pay that. There's no question about it. However, it still has to be a work-related injury. Dr. Brown's finding of causation was at the May 21, 2009 appointment. He never says it again after that. He doesn't say it again after he looks at the MRI. He's definitely not saying it after the surgery. And Ms. Rich in her brief on page 24, she's got the brief in there, and the highlighted portions of it make it real clear that what they found was wrong. It's the same thing that was on the other side that wasn't an injured body part. Clearly, it's a genetic thing. For that reason, we say it's against the manifest way to the evidence, and so we are asking for that to be vacated. Unless you all have any questions, that's the only argument. Thank you, counsel, all, for your arguments. Ms. Watson and Ms. Meyers, this morning, will be taken under advisement and a written disposition shall issue. Please call the next case, last case of the morning.